## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT M. DALLAS.                  :
                                   :
        Plaintiff,                 :   No.:
                                   :
    v.                             :
                                   :   **TRIAL BY JURY DEMANDED**
                                   :
HEATHER FLYNN,                     :
                                   :
        Defendant.                 :

## COMPLAINT

Plaintiff, Robert M. Dallas, by and through his attorneys, Thomas W. King III, Esquire, Ronald T. Elliott, Esquire, and Dillon McCandless King Coulter & Graham, LLP, files this Complaint against Defendant, Heather Flynn, and avers as follows:

## PARTIES

1. Plaintiff, Robert M. Dallas, is an adult individual and citizen of the State of Texas who resides at 1116 Daylily Drive, Northlake, Texas 76226.

2. Plaintiff brings this action in his individual capacity.

3. Plaintiff is the son of Margaret M. Dangerfield, formerly known as Margaret Dallas, who died on April 10, 2025, a resident of Blair County, Pennsylvania and whose Estate is in probate in said county.

4. Plaintiff is also the brother of Defendant, Heather Flynn.

1

5. Defendant, Heather Flynn, is an adult individual and a resident of the Commonwealth of Pennsylvania, residing at 516 October Court, Pittsburgh, PA 15239.

6. Defendant resides in the Western District of Pennsylvania.

7. References herein to Plaintiff's role as power of attorney, Executor, or fiduciary are included as factual background and do not alter the fact that Plaintiff brings this action in his individual capacity for personal damages arising from Defendant's abuse of process and related claims.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C.A. §1332 because there is complete diversity of citizenship between Plaintiff and Defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this judicial district.

10. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events, allegations, publications, investigation, court proceedings, and harm alleged herein occurred in Blair County, Pennsylvania, within the Western District of Pennsylvania.

11. Plaintiff seeks damages against Defendant for abuse of process and defamation as set forth hereinafter.

## FACTUAL BACKGROUND

12. Margaret M. Dangerfield died on April 10, 2025, a resident of Blair County, Pennsylvania, in the Western District of Pennsylvania.

13. Before her death, Margaret Dangerfield had been released from a nursing facility and returned home on hospice care.

14. The events and allegations concerning Margaret Dangerfield's death occurred in Blair County, Pennsylvania.

15. Margaret Dangerfield's residence was located at 354 Oak Knoll Road, Hollidaysburg, Blair County, Pennsylvania 16648.

16. Plaintiff was present at or involved with Margaret Dangerfield's care near the end of her life and served as her attorney in fact and as her designated attorney in fact for health care decisions.

17. Shortly after Margaret Dangerfield's death, Defendant made and repeated accusations specifically alleging that Plaintiff caused, contributed to, or was involved in Margaret Dangerfield's death. According to the Pennsylvania State Police materials, "after speaking with DANGERFIELD's daughter, namely Heather Dallas FLYNN, it became clear that she had concerns relating to DALLAS's involvement in DANGERFIELD's death." Defendant further reported that Plaintiff had made a comment about "'snowing' their mother," which the Pennsylvania State Police materials described as "meaning to intentionally overdose DANGERFIELD,"

3

and that Defendant was concerned Plaintiff "may have administered a large amount" of "oxy" to Margaret Dangerfield from an older bottle.

18. Defendant made these accusations to law enforcement as well as to residents of the Hollidaysburg community, funeral home personnel, relatives and to the Court.

19. Upon information and belief, Defendant also repeated the same accusations to persons in the community, including family members, acquaintances, neighbors, members of the Hollidaysburg community, persons or entities connected to Margaret Dangerfield's care, including her nursing home/care facility, and other third parties whose identities will be developed through discovery.

20. Upon information and belief, Defendant repeated the same accusations to third parties outside law enforcement and inside and outside of judicial proceedings, including family members, neighbors, members of the Hollidaysburg community, financial institutions, care providers, insurance representatives, and other persons or entities.

21. Upon information and belief, Defendant repeated the accusations to members of Margaret Dangerfield's family, including members of the McGuirk and Bechet families and threatened a "Slayer's Act" case filing.

22. Upon information and belief, Defendant repeated the accusations to specific relatives and family contacts, including Marianne Bechet, Cynthia Bechet,

4

Catherine Downey, Charlotte Flynn, Nolan Flynn, Catherine Madden, Cory Madden, Patricia McGuirk, Teresa McGuirk, and other cousins and family members.

23. Upon information and belief, Defendant repeated the accusations to persons and entities connected to Margaret Dangerfield's care, property, finances, insurance, and estate affairs, including Dave Mason Funeral Home, Presbyterian Village, Gentiva Hospice Care, Altoona Hospital physicians and providers, Penn National Insurance, Fidelity Investments, M&T Bank, Citizens Bank, and direct neighbors of Margaret Dangerfield.

24. Upon information and belief, these third-party publications were made outside any protected law-enforcement report, outside any court filing, and outside any privileged communication made solely in the regular course of judicial proceedings.

25. Upon information and belief, Defendant's repetition of the accusations continued after September 23, 2025, including communications with family members, banks, and members of the community.

26. On September 23, 2025, Defendant's then-counsel represented that the Pennsylvania State Police, Presbyterian Village, Gentiva Hospice, Fidelity Investments, and M&T Bank had produced documents relating to Margaret Dangerfield's care and the investigation of the circumstances leading to her death and further stated that "Heather intends to pursue a Slayer's Act case." Counsel

further stated that "a finding that Rob harmed and/or attempted to harm Meg physically or financially would result in him being barred from benefiting financially from her death."

27. The September 23, 2025, correspondence reflects that Defendant's accusations concerning Plaintiff's alleged physical or financial harm to Margaret Dangerfield continued well after the initial April 2025 report.

28. Upon information and belief, Defendant's accusations caused family members, community members, and third parties to avoid contact with Plaintiff, cut ties with Plaintiff, question Plaintiff's character, question Plaintiff's role in Margaret Dangerfield's death, and question Plaintiff's right to receive assets from Margaret Dangerfield or her Estate.

29. The Blair County Coroner's report states that Gentiva Hospice received a call from a family member indicating that "the decedent's son may have overdosed the decedent on previously prescribed medications."

30. As a result of that report, the Coroner requested that police respond to the residence for a suspicious death, possible drug overdose.

31. The Coroner then requested that police meet him at that address for a "suspicious death, possible drug overdose."

32. The Pennsylvania State Police thereafter became involved in the investigation of Margaret Dangerfield's death.

33. The Pennsylvania State Police materials state that, after speaking with Defendant, "it became clear that she had concerns relating to DALLAS's involvement in DANGERFIELD's death."

34. The Pennsylvania State Police materials further state that Defendant reported that Plaintiff "is a recovering alcoholic and has been unemployed since 2020."

35. Defendant also reported that Plaintiff was "under financial stress," that Plaintiff was Power of Attorney for Margaret Dangerfield, and that Margaret Dangerfield had "nearly $8 million dollars in her bank account."

36. Defendant further reported that Plaintiff made a comment to Defendant approximately two weeks earlier relating to "'snowing' their mother," which the police materials describe as "meaning to intentionally overdose DANGERFIELD."

37. Defendant further reported that Plaintiff had recently removed an older bottle of "oxy" from Margaret Dangerfield's residence and that she was concerned Plaintiff "may have administered a large amount to her from that older bottle."

38. Defendant further reported that Plaintiff was "adamant" about Margaret Dangerfield signing a Do Not Resuscitate Order, which Defendant claimed was strange because of what she characterized as a minor injury.

39. Defendant reported that Plaintiff had changed locks to Margaret Dangerfield's residence and did not permit Defendant to possess a key.

7

40. Defendant's accusations were false, grave and damaging because they alleged that Plaintiff intentionally caused or contributed to his mother's death.

41. Defendant's accusations were not supported by the medical conclusions reached after investigation including the County Coroner's Report which concluded that Margaret died of natural causes.

42. The forensic pathologist concluded that Margaret Dangerfield's death was a natural death and that the cause of death was pneumonia.

43. The Pennsylvania State Police General Offense Report quotes the forensic pathologist as follows: "this patient did not die of a drug overdose. The patient died of pneumonia."

44. On May 23, 2025, the death call type was changed from "Death - Unknown" to "Death - Natural."

45. The Pennsylvania State Police investigation was closed on or about June 18, 2025, and no criminal charges were ever filed against Plaintiff.

46. Despite the absence of medical support for Defendant's accusations that Plaintiff caused or contributed to Margaret Dangerfield's death, Defendant used the existence of the investigation and the allegations concerning Plaintiff's supposed involvement in Margaret Dangerfield's death to pursue ex parte emergency civil process against Plaintiff.

8

47. On or about April 17, 2025, Defendant filed a Complaint and Petition for Emergency Preliminary Injunction against Plaintiff in the Court of Common Pleas of Blair County, Pennsylvania, at 2025 OC 145.

48. In that filing, Defendant alleged that the Pennsylvania State Police had opened a "criminal investigation of Defendant relative to Ms. Dangerfield's death and financial transactions in which Defendant engaged prior to Ms. Dangerfield's death."

49. Defendant further alleged that Plaintiff was designated as a beneficiary under one or more of Margaret Dangerfield's retirement and/or investment accounts.

50. Defendant further alleged that, "[i]f Defendant were ultimately determined not to be entitled to such funds, recovery of such funds would likely be difficult if not impossible."

51. Defendant requested emergency injunctive relief "[i]n light of the criminal investigation of [Plaintiff] and the potential implications thereof."

52. Defendant thereby used accusations concerning Margaret Dangerfield's death, and the existence of an investigation resulting from those accusations, to seek immediate civil restrictions against Plaintiff.

53. Specifically, Defendant sought to prohibit Plaintiff from taking possession or control of assets of Margaret Dangerfield and/or George Dangerfield

and their respective estates, including retirement, life insurance, and other financial accounts, regardless of beneficiary designations.

54. Defendant's request was not limited to probate assets of Margaret Dangerfield's Estate.

55. Defendant sought relief affecting assets that were payable to Plaintiff individually or otherwise were non-probate assets.

56. Defendant sought to use the civil process to restrain Plaintiff and Plaintiff's access to and control over the estate and its assets and even jointly held funds, before there had been any medical finding, criminal charge, or civil adjudication supporting the accusation that Plaintiff caused or contributed to Margaret Dangerfield's death.

57. Based on these gross misrepresentations and falsehoods, on April 17, 2025, the Court entered an emergency preliminary injunction order.

58. The April 17, 2025 Order prohibited Plaintiff from transferring, taking possession of, and/or controlling assets of Margaret Dangerfield and/or George Dangerfield and/or their respective estates, including retirement, life insurance, and other financial accounts, regardless of beneficiary designations, pending further Order of Court.

59. Defendant's actions caused Plaintiff to incur great mental, physical and emotional distress and to attorneys' fees and costs. Due to the restrictions obtained

by Defendant, Plaintiff was also required to pay expenses relating to the maintenance of the Estate, including burial expenses and other estate-related expenses, from his own funds.

60. The April 17, 2025, Order set a hearing and transferred the matter to Orphan's Court.

61. Thereafter, on April 21, 2025, the Court entered an Order restricting the disbursement, conveyance, or distribution of assets or funds of Margaret Dangerfield or the Estate of Margaret Dangerfield, except that Plaintiff was permitted to pay Estate expenses from the Fidelity joint account.

62. Defendant thereafter continued to use the civil process arising from the emergency injunction action to restrict Plaintiff's access to financial accounts and estate-related assets and to harass and humiliate Plaintiff.

63. Defendant also pursued discovery concerning Plaintiff and estate financial institutions, including Fidelity Investments and M&T Bank.

64. Defendant filed a Certificate Prerequisite to Service of Subpoena upon Fidelity Investments pursuant to Pennsylvania Rule of Civil Procedure 4009.22, and also obtained or pursued documents relating to M&T Bank.

65. Defendant's use of civil process was not primarily for the legitimate purpose of preserving estate assets.

11

66. Defendant used the investigation and civil injunction process to obtain leverage concerning probate and non-probate assets, including assets allegedly payable to Plaintiff individually.

67. Defendant used the investigation and civil injunction process to pressure Plaintiff in disputes over probate and non-probate assets.

68. Defendant used the investigation and civil injunction process to pressure Plaintiff to transfer or share assets that otherwise would have been payable to him individually.

69. Defendant's actions caused Plaintiff to incur attorneys' fees and costs.

70. Defendant's actions also caused Plaintiff financial harm by restricting his access to and control over funds during a period of significant market opportunity in April 2025. Plaintiff had intended to invest funds following market declines, as he did with his own portfolio, but was precluded from doing so as a result of Defendant's actions and the restrictions imposed on the accounts. Plaintiff's financial losses, including lost investment opportunity, will be proven at trial.

71. Defendant's actions interfered with Plaintiff's ability to administer Margaret Dangerfield's Estate.

72. Defendant's actions harmed Plaintiff personally, financially, and reputationally.

73. Defendant's conduct caused Plaintiff mental, physical and emotional distress, humiliation, and damage arising from being accused of causing or contributing to his mother's death.

74. Defendant's conduct damaged Plaintiff's reputation in the community.

75. Defendant's actions were intentional, malicious, and undertaken for an improper purpose.

76. Defendant acted with reckless disregard for the truth or falsity of her allegations concerning Plaintiff's supposed involvement in Margaret Dangerfield's death.

77. Defendant acted with the intent to use law enforcement involvement and civil court process as leverage against Plaintiff.

### COUNT I: ABUSE OF PROCESS

78. Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

79. Under Pennsylvania law, abuse of process is the use of legal process against another primarily to accomplish a purpose for which the process was not designed.

80. To establish abuse of process, a plaintiff must show that the defendant: "(1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose

for which the process was not designed; and (3) harm has been caused to the plaintiff." *Lerner v. Lerner*, 954 A.2d 1229, 1238 (Pa. Super. Ct. 2008).

81. *Lerner* further explains that, unlike wrongful use of civil proceedings, "the existence of probable cause" is immaterial to abuse of process, because the gravamen of the claim is the "perversion of the particular legal process" for an unauthorized purpose. *Id*.

82. In *Morley v. Farnese*, the Commonwealth Court explained that abuse of process involves "the perversion of legal process after it has begun" and described the tort as the use of legal process as a "tactical weapon to coerce a desired result" that is not the legitimate object of the process. *Morley v. Farnese*, 178 A.3d 910, 919 (Pa. Cmwlth. 2018).

83. *Morley* further explains that bad motive alone is insufficient; rather, the plaintiff must show an act or threat not authorized by the process, or use of the process for an illegitimate aim such as coercing the plaintiff to take collateral action. *Id.*

84. Defendant used legal process against Plaintiff.

85. Defendant's use of legal process included, but was not limited to, the filing and prosecution of the Complaint and Petition for Emergency Preliminary Injunction in Blair County, the procurement and use of the emergency preliminary

14

injunction order, the continuation of restrictions on Plaintiff's access to assets and accounts, and related discovery, subpoenas, or account-access efforts.

86. Defendant did not merely report concerns to law enforcement.

87. Defendant used the resulting investigation and allegations concerning Margaret Dangerfield's death as a basis to invoke civil court process against Plaintiff.

88. Defendant used the civil injunction process to obtain immediate restrictions against Plaintiff before there had been any adjudication that Plaintiff had committed wrongdoing.

89. Defendant used the civil injunction process to restrain or interfere with assets that were not limited to probate assets of Margaret Dangerfield's Estate, including assets payable to Plaintiff individually or otherwise passing outside probate.

90. Defendant further used the injunction process after it began to maintain pressure upon Plaintiff, interfered with his access to and control over assets, and obtain leverage concerning probate and non-probate assets.

91. Defendant used the legal process primarily to accomplish purposes for which the process was not designed.

92. Defendant's improper purposes included pressuring Plaintiff, coercing concessions from Plaintiff, restraining non-probate assets payable to Plaintiff

individually, interfering with Plaintiff's financial rights, and using suspicion arising from Margaret Dangerfield's death as leverage in disputes over assets.

93. Defendant's purpose was not merely to preserve estate assets.

94. Defendant's use of the process was a perversion of that process because she used the civil injunction proceeding and related court process to pursue collateral objectives, including restraining Plaintiff's individually payable assets and pressuring Plaintiff in inheritance and asset disputes.

95. Defendant's conduct constituted a definite act or course of conduct using process for an illegitimate collateral objective.

96. Defendant's conduct caused harm to Plaintiff.

97. As a direct and proximate result of Defendant's abuse of process, Plaintiff suffered damages, including attorneys' fees, litigation expenses, loss of access to or control over assets, reputational harm, mental, physical and emotional distress, and other damages to be proven at trial.

98. Defendant's conduct was willful, malicious, outrageous, and in reckless disregard of Plaintiff's rights.

99. Plaintiff is entitled to compensatory damages.

100. Plaintiff is further entitled to punitive damages.

**COUNT II: DEFAMATION**

16

101.   Plaintiff incorporates the foregoing paragraphs as though fully set forth herein.

102.   Defendant repeatedly made and published the foregoing false statements concerning Plaintiff.

103.   Defendant's statements concerned Plaintiff and were understood by recipients to refer specifically to Plaintiff.

104.   Defendant stated that Plaintiff caused, contributed to, or was involved in Margaret Dangerfield's death.

105.   Defendant stated that Plaintiff intentionally overdosed Margaret Dangerfield or administered excessive medication to her.

106.   Defendant stated that Plaintiff acted out of financial motive because he was under financial stress, served as power of attorney, and was connected to Margaret Dangerfield's financial accounts.

107.   Defendant published these statements to law enforcement as well as to numerous other persons previously identified herein on who may be discovered as part of this litigation.

108.   As set forth more fully above, upon information and belief, Defendant published and republished the accusations to unprivileged third parties, including family members, neighbors, community members, financial institutions, care

providers, insurance representatives, funeral-home personnel, and other persons or entities.

109.    Upon information and belief, Defendant's defamatory publications and republications continued into and after September 2025 and to the date of this action.

110.    Those publications and republications were made to persons who were not reasonably necessary to any law-enforcement report, judicial proceeding, or privileged communication.

111.    Those publications and republications constituted publication to unprivileged third parties.

112.    Those publications and republications caused reputational, personal, and financial harm to Plaintiff.

113.    Under Pennsylvania law, "[a] communication is defamatory if it tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Maier v. Maretti*, 671 A.2d 701, 704 (Pa. Super. Ct. 1995).

114.    A communication is also defamatory if it "ascribes to another conduct, character or a condition that would adversely affect his fitness for the proper conduct of his proper business, trade or profession." *Id.*

115.    Defendant's accusations that Plaintiff caused, contributed to, or was involved in his mother's death, including accusations suggesting that Plaintiff

18

intentionally overdosed Margaret Dangerfield or administered excessive medication to her, were defamatory.

116. Defendant's accusations were not merely embarrassing, annoying, crude, or insulting statements.

117. Defendant's accusations imputed serious criminal, immoral, and reprehensible conduct to Plaintiff.

118. In *Maier*, the Superior Court distinguished non-actionable insults from statements implying criminal conduct, noting that in *Agriss v. Roadway Express, Inc.*, a statement "was capable of defamatory meaning because it implied the employee had committed a crime." *Id.* at 705.

119. The accusations at issue here likewise implied criminal conduct because Defendant stated and/or implied that Plaintiff intentionally caused or contributed to Margaret Dangerfield's death.

120. The nature of the audience is relevant to whether a communication is defamatory. As *Maier* explains, "the nature of the audience hearing the remarks is a critical factor in determining whether the communication is defamatory." *Id.*

121. Defendant's statements were published and republished to persons who would reasonably understand the accusations to mean that Plaintiff had killed, overdosed, intentionally harmed, financially exploited, or attempted to harm his mother.

19

122.  Defendant's statements were understood by recipients as referring to Plaintiff.

123.  Defendant's statements were understood by recipients as defamatory.

124.  Defendant's statements were false.

125.  Margaret Dangerfield's death was determined to be natural.

126.  Margaret Dangerfield's cause of death was determined to be pneumonia.

127.  The Pennsylvania State Police General Offense Report quotes the forensic pathologist as stating: "this patient did not die of a drug overdose. The patient died of pneumonia."

128.  No criminal charges were filed against Plaintiff.

129.  Defendant either knew that the statements were false or acted negligently and/or recklessly with respect to their truth or falsity.

130.  Defendant's statements harmed Plaintiff's reputation, lowered him in the estimation of the community, deterred third persons from associating or dealing with him, and caused humiliation, embarrassment, mental, physical and emotional distress, and other damages.

131.  Defendant's statements damaged Plaintiff's standing in the community.

132. Defendant's statements constituted defamation per se because they imputed serious criminal conduct to Plaintiff, including intentionally causing or contributing to his mother's death.

133. Defendant's repetition of the accusations to family members, neighbors, community members, financial institutions, care providers, insurance representatives, funeral-home personnel, and other third parties outside law enforcement and outside judicial proceedings constituted over-publication and/or publication to unauthorized persons.

134. Defendant's statements to third parties outside law enforcement and outside judicial proceedings were not protected by any privilege.

135. To the extent Defendant claims a conditional privilege, Defendant abused any such privilege by publishing the accusations with malice, negligence, reckless disregard for the truth, for an improper purpose, and to persons who were not reasonably necessary to any privileged purpose.

136. As a direct and proximate result of Defendant's defamatory statements, Plaintiff suffered damages, including reputational harm, humiliation, embarrassment, mental, physical and emotional distress, damage to his standing in the community, damage to family relationships, damage to personal and business relationships, financial loss, attorneys' fees and costs, and other damages to be proven at trial.

21

137. Defendant's conduct was malicious, willful, and in reckless disregard of Plaintiff's rights.

138. Plaintiff is entitled to compensatory damages.

139. Plaintiff is further entitled to punitive damages.

## PRAYER FOR RELIEF

Plaintiff, Robert M. Dallas, respectfully requests that this Honorable Court grant relief as follows:

1. An Order entering judgment in favor of Plaintiff, Robert M. Dallas, and against Defendant, Heather Flynn, on Plaintiff's claim for abuse of process.

2. An Order entering judgment in favor of Plaintiff, Robert M. Dallas, and against Defendant, Heather Flynn, on Plaintiff's claim for defamation.

3. An Order finding that Defendant misused legal process for an improper and collateral purpose.

4. An award of compensatory damages in an amount to be determined at trial.

5. An award of punitive damages in an amount to be determined at trial.

6. An award of pre-judgment and post-judgment interest as permitted by law.

7. An award of costs and attorneys' fees to the extent recoverable by law.

8. Trial by jury on all issues so triable.

9. Such other and further relief as this Court deems just and proper.

**[SIGNATURE PAGE TO FOLLOW]**

Respectfully submitted,

**DILLON McCANDLESS KING COULTER & GRAHAM LLP**

By: /s/ Thomas W. King III
     Thomas W. King III, Esquire
     PA I.D. No. 21580
     tking@dmkcg.com
     Ronald T. Elliott, Esquire
     PA I.D. No. 71567
     relliott@dmkcg.com

     *Counsel for Plaintiff*

23

# VERIFICATION

I, Robert M. Dallas, hereby verify that I am the Respondent in the foregoing document; that I am authorized to make this Verification; and that the facts set forth therein are true and correct to the best of my personal knowledge, information, and belief.

I understand that the statements made herein are subject to the penalties of 18 28 U.S.C. § 1746 relating to unsworn falsification to authorities.

Date: July 20, 2026

Robert M. Dallas

24